I dissent because I believe that the trial court erred by directing a verdict for the Coshatts on the breach of contract claim. I would, therefore, reverse in part in favor of National Security and remand for a new trial on the contract claim.
The trial court erred in directing a verdict for the Coshatts on their contract claim because the record discloses genuine issues of material fact surrounding the validity of the contract claim and whether the Coshatts sustained their burden of showing that National Security had no legal or factual basis for its failure to pay the claim.
The record reveals that the insurance agent who administered the Coshatts' policy, Jack Barber, testified that he received a telephone call from the Coshatts within 24 to 36 hours after the snowstorm. He informed the Coshatts that, according to their policy, they could take whatever steps were necessary to protect the property from any further damage. Barber told Ms. Coshatt to keep the repair bills and a list of any repairs done and the cost of the repairs. Barber did not ask the Coshatts if he could come and inspect the damage; he stated that the roads were impassable at that time. Barber did state, however, that he was in constant contact with the Coshatts over the next week or 10 days following the storm. Barber did eventually visit the dwelling and when he did so he expressed no concern or reservation about not having inspected the dwelling before the completion of the repairs. Barber, however, did not tell the Coshatts to completely repair the damage to their home. *Page 397 
Barber also testified that he telephoned the home office on the Tuesday following the March 12, 1993, storm. Barber stated that the claim should have been logged in on that day. Barber did not receive the proof of loss forms from the company until April. A month later, Barber terminated his employment with National Security because National Security would not pay claims that Barber thought it should pay.
Jack Bonner, claims manager for National Security, testified that no records or telephone logs indicating the Coshatts' claim were received by National Security until April 16, 1993. The notice of loss claim came from Barber with a proposal and bill from Lawrence Oglesby, the carpenter who repaired the Coshatts' home. The claim was assigned to Melinda Carpenter, the claims examiner, on April 23. Carpenter, upon Bonner's approval, assigned the claim to an independent adjusting firm. The adjuster, after several failed attempts at inspecting the Coshatts' home, viewed the damage and recommended that National Security pay the claim. Several months later, an adjuster with the firm recorded a conversation with Ms. Coshatt. The adjuster questioned Ms. Coshatt regarding the authorization for the repair work, and she told him that she authorized Mr. Oglesby to repair the damage.
Bonner testified that the Coshatts' claim was denied because National Security was not given the opportunity to inspect the damage before the repairs were made. Bonner stated that he felt this was a reasonable basis for denying the claim because National Security could not determine the cause of the damage or the amount of the loss and, thus, the accurate cost of the repair.
Ms. Coshatt testified that she contacted Oglesby about the repairs after Barber told her she could. She stated that when she woke up the morning after the storm, her bed was wet because the wind blew "the gable out at the end of house, blowed my ridge cap off and blowed my roofing off." She testified that the damage caused the sheetrock to sag in her bedroom. She authorized Mr. Lawrence Oglesby to make the repairs quickly because another storm was expected. The repairs were completed on March 19, 1993.
National Security claims that it was not notified of the loss and allowed to inspect the damage before the repairs were completed. Because the Coshatts had the damage to their home repaired so quickly, a crucial issue at trial was the date on which they notified National Security of the loss.
At trial, Ms. Coshatt stated that she called Barber the day after the storm from a pay telephone at the hotel where she and her family stayed after the storm. She said Barber assured her that the claim would be paid. Counsel for National Security questioned her about her interrogatories in which she had stated that she contacted Barber one to two weeks after the storm. In her deposition, Ms. Coshatt stated that she called Barber on the Monday following the storm. Mr. Coshatt testified that the Coshatts called Barber the day following the storm. In his interrogatories, however, Mr. Coshatt also stated that they contacted Barber one to two weeks after the storm.
Although Rule 801(d)(2), Ala.R.Evid., would appear to make the Coshatts' answers to interrogatories admissible as party admissions, that rule was not applicable here because the Coshatts' lawsuit was filed before January 1, 1996. The Coshatts' answers to interrogatories were, however, clearly admissible to impeach their trial testimony. See C. Gamble,McElroy's Alabama Evidence § 290.01(15) (5th ed. 1996). From the conflicts in the Coshatts' testimony, it is apparent that there was a genuine dispute regarding notification of the alleged damage to National Security.
Mr. Oglesby testified that he did complete the repairs to the house. He said he inspected the damage and noted that some shingles were missing on the ridge and on one end of the house; that the siding and gables were blown out; that there was a big hole; and that there was a great deal of water damage in the bedroom and hall. Mr. Oglesby testified that he replaced the ridge cap; replaced the shingles; repaired the siding and gable in the end of the house; finished taking the ceiling out of the hall closet and bedroom and replaced it with new sheetrock and put a *Page 398 
primer coat on it. He stated that patch work would have taken just as long as the complete repairs; however, he said, he was asked to make complete repairs. He said that he could have done preventive repairs to the outside, but could not have guaranteed that the preventive repairs would last. He claimed that there was nothing on his proposal that he did not eventually do with regard to repairing the Coshatts' home.
Melinda Carpenter, the claims examiner at National Security, did not receive a claims report on the Coshatts' claim until April 1993. She stated that it was company policy to start a file on an insured's claim when the claim was called in to the office. She recommended denial of the claim because she did not have any information from anyone at National Security who had authorized the repairs. She said that during the ensuing months, she spoke with Barber about other matters, but that he never mentioned that he had authorized the repairs to the Coshatts' house. After she denied the claim, she said, she asked Barber to review the denial and she said he "okayed" it. Carpenter said she spoke with Ms. Coshatt and explained the denial to her. She said Ms. Coshatt never told her that Barber authorized the repairs.
Although Barber testified that the Coshatts notified him of the loss within 24 to 36 hours after the snowstorm (i.e., by March 14), and that he notified the company of the loss by March 16, the accuracy of that testimony was called into question by other evidence indicating that the company received no notice of the Coshatt claim until April 16, that Barber "okayed" the denial of the Coshatt claim, and that Barber left the company because of a dispute with the company over its nonpayment of the Coshatt claim. Barber was the Coshatts' witness, and he was obviously hostile to National Security. Under the circumstances, it was for the jury to decide the accuracy of Barber's testimony as to the time the Coshatts notified him of the loss.
The record indicates factual disputes regarding whether National Security received notification of the claim before the damage was repaired and whether anyone from National Security authorized the repairs. Additionally, there are factual disputes as to whether the Coshatts breached their obligations under the policy to allow National Security to inspect the damage before it was repaired. Thus, the trial court erred in directing a verdict for the Coshatts on the breach of contract claim. These issues should have been resolved by the jury. Accordingly, because the Coshatts were not entitled to a directed verdict on the breach of contract claim, the trial court erred in submitting the bad-faith-refusal-to-pay claim to the jury. It is clear that if the insured is not entitled to a directed verdict on the breach of contract claim, then the tort claim must fail and should not be submitted to a jury. SeeNational Savings Life Insurance Co. v. Dutton, 419 So.2d 1357
(Ala. 1982).
Accordingly, I would reverse the trial court's judgment on the breach of contract claim, reverse the judgment on the bad-faith-failure-to-pay claim, and render a judgment for the defendant on that claim, and remand the case for a new trial on the breach of contract claim.